**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JANE DOE, individually,
and on behalf of others
similarly situated,

Plaintiffs,

v.

CITY OF DETROIT, a Michigan municipal corporation; DETROIT POLICE DEPARTMENT; BENJAMIN WAGNER, an individual; and DPD "DOE" DEFENDANTS,

Defendants.

Case No. ______________
Hon.
Mag.

---

# CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, JANE DOE, individually, and on behalf of the proposed class ("Plaintiff"), for the Complaint against Defendants CITY OF DETROIT (the "City"), DETROIT POLICE DEPARTMENT ("DPD"), BENJAMIN WAGNER ("Wagner"), and DPD "DOE" DEFENDANTS, states:

## INTRODUCTION

1. This case arises from a municipal failure with devastating consequences: the City of Detroit armed and employed Officer Benjamin Wagner, ignored warning signs, and buried the DNA evidence that could have exposed him as a serial rapist years ago.

2. For nearly two decades, Wagner used his patrol car, service weapon, and badge to target women. The City employed him, returned him to duty after warning signs, and maintained an evidence system that left nearly 12,000 rape kits untested and ignored.

3. Plaintiff always knew that a uniformed officer in a marked patrol car attacked her, but she never knew which officer. In March 2026, Plaintiff learned for the first time, through DNA testing connected to this backlog, that Benjamin Wagner was the man who kidnapped and raped her at gunpoint in October 2005.

4. Wagner was not charged until March 2026 after retiring from DPD and relocating to Greenville, South Carolina. He now faces six kidnapping counts and fourteen criminal-sexual-conduct counts involving at least six women. His alleged method was consistent—use a marked police car and weapon to isolate and rape women.

5. The City was on notice. In 2002, Wagner was tried for sexually assaulting his stepdaughter. After his acquittal, the City returned him to full duty without restrictions, monitoring, or further investigation, and he patrolled for roughly fifteen more years.

6. In 2009, the Wayne County Prosecutor's Office discovered nearly 12,000 untested rape kits in a Detroit police warehouse. Testing later identified more than 850 serial rapists with ties to 40 states, including Wagner.

7. Although Michigan State Police linked Wagner's DNA to an unsolved sexual assault as early as 2010, and the FBI identified a lead in 2023, Wagner was not arrested until March 2026.

8. Plaintiff brings this action for herself and a class of survivors whose kits were warehoused, whose assailants remained free, and whose constitutional rights were treated as expendable.

9. This conduct violates 42 U.S.C. § 1983 (Fourth and Fourteenth Amendments), Article 1, § 17 of the Michigan Constitution, the Elliott-Larsen Civil Rights Act, and Michigan common law.

10. Plaintiff seeks compensatory damages, punitive damages against the individual Defendants under 42 U.S.C. § 1983, exemplary damages under Michigan law, declaratory and injunctive relief, and all other relief available to her and the proposed class.

## PARTIES, JURISDICTION, AND VENUE

11. Plaintiff is a resident of Detroit, Wayne County, Michigan.

12. Defendant City of Detroit ("the City") is a Michigan municipal corporation that operates and is responsible for the Detroit Police Department.

13. Defendant Detroit Police Department ("DPD") is the law-enforcement agency of the City of Detroit responsible for investigating crimes, including sexual assaults, and for the collection, storage, testing, and processing of rape kits. The City

is liable for the policies, customs, and practices of DPD and its policymakers, and all allegations concerning DPD are made against the City.

14. Defendant Benjamin Wagner ("Wagner") served as a sworn DPD officer for nearly three decades. He retired in or about 2017 and relocated to Greenville, South Carolina. He is sued in his individual capacity.

15. DPD "Doe" Defendants are presently unknown DPD personnel, including but not limited to: (a) the supervisors and command officers who approved Wagner's return to full duty after his 2002 trial and who were responsible for supervising him thereafter; (b) the male and female officers who responded to Plaintiff's February 2006 report; (c) the officers who responded to Plaintiff's December 3, 2008 report; (d) property and evidence personnel and supervisors responsible for storing, submitting, and tracking Plaintiff's and other similarly situated individuals' rape kits; and (e) the investigators, evidence technicians, and policymakers. Their identities will be ascertained through discovery, and Plaintiff will seek leave to substitute their names. They are sued in their individual capacities.

16. This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under 42 U.S.C. § 1983 and the United States Constitution. This Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28 U.S.C. § 1367.

17. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in the City of Detroit, Wayne County, Michigan.

## FACTUAL ALLEGATIONS

### A. The Detroit Rape Kit Backlog

18. In 2009, the Wayne County Prosecutor's Office discovered nearly 12,000 untested rape kits in a DPD warehouse—evidence collected from survivors brave enough to come forward, submitted for testing, and abandoned, some for decades.

19. A decade-long testing project followed and identified more than 850 serial rapists with ties to 40 states.

20. During the same period, DPD routinely submitted and processed forensic evidence in other categories of violent crime, including homicides and non-sexual assaults. Sexual assault kits—submitted overwhelmingly by women—were singled out for non-submission and storage.

21. For years, survivors were not told their kits were untested, their cases uninvestigated, or their assailants still unidentified.

22. DPD's deliberate indifference to the rights of sexual assault survivors was systemic, longstanding, and shocking to the conscience.

### B. Plaintiff's Assaults and Reports

23. **October 2005 (Officer Wagner):** Plaintiff was walking home from a gas station near Wyoming and Puritan in Detroit at about 9:00–10:00 p.m., when Wagner pulled up alongside her in a marked DPD patrol car, accused her of being out past curfew, and ordered her to bring her ID to his vehicle.

24. When Plaintiff approached, Wagner displayed a handgun pointed toward her and warned: “Don’t run or I’m going to shoot you.” He then forced her into the police car.

25. Wagner drove Plaintiff to an abandoned, boarded-up area and parked his car. He held the gun to her head, repeatedly clicked the trigger, and threatened to kill her. He forced her to perform oral sex on him while repeatedly clicking the trigger. He told her he “could kill [her] right now.” He pushed her down so she was lying flat and raped her in the front bench seat of the patrol car without a condom.

26. Before abandoning Plaintiff in the deserted area, Wagner told her: no one would believe her; she would be called crazy or a liar; and if she went to the police, “one of his buddies” would “come and finish the job.”

27. Plaintiff was 18 years old at the time.

28. Plaintiff did not report the assault. Wagner’s threats achieved their intended purpose. Plaintiff feared for her life and the safety of her young daughter. Because her attacker was a police officer who had warned that fellow officers would

kill her if she reported, Plaintiff reasonably believed that going to DPD would expose her to retaliation by the very department charged with protecting her.

29. Plaintiff did not know Wagner's name, badge number, or patrol-car number, and had no means of identifying him among the approximate 4,300 officers on DPD patrol in 2005. Wagner was not identified and charged until March 2026, roughly twenty years later, after DNA testing established his identity.

30. **February 2006 (Lavelle Davis):** About three months later, Lavelle Davis, a family friend who had molested Plaintiff as a child from approximately age 2–3 until age 7, and later proved to be a serial offender connected to the Detroit rape-kit backlog, dragged Plaintiff from a family function and raped her.

31. Plaintiff reported the Lavelle Davis assault and underwent a rape kit at St. John Hospital, but DPD officers, a male and a female, called her names, called her a liar, refused to record her statement, and told her she was reporting a "trick gone bad."

32. She was given a detective's card which led nowhere, and her rape kit was warehoused without testing.

33. **December 3, 2008 (Jesse Harris):** At about 6:00 a.m., while Plaintiff was walking to a bus stop on her way to work as an instructor with Detroit's Inner City Drill Team, a man emerged from a black van with green stripes near Joyce Elementary School, put a knife to her throat, dragged her into the van, and raped her.

34. Plaintiff still bears a mark on her neck from the knife.

35. Plaintiff called 911; ambulance and police responded and transported her to Receiving Hospital, where a rape kit was performed.

36. DPD officers again called Plaintiff names, refused to record her report, accused her of being "combative," and treated her as a liar—the same response she received in 2006. Plaintiff later learned through the court process that her assailant was Jesse Harris.

**C. The Consequences of the Backlog for Plaintiff**

37. In 2016, Plaintiff received a victim-notification phone call asking whether she remembered December 3, 2008. By then, DPD had finally tested her kit and obtained a DNA hit identifying Jesse Harris. Plaintiff was told they "had" her rapist, leading her to believe Harris was in custody and off the streets, when in fact DPD had only a DNA hit and needed her help to locate and arrest him.

38. Plaintiff later encountered Harris in the community, causing severe emotional distress and underscoring the misleading nature of the notification she received.

39. Harris was prosecuted in 2016-2017. Although he was a known serial rapist, Plaintiff's case was the only prosecutable case because the backlog delay allowed the limitations period to expire on his other victims' cases.

40. Harris was found not guilty by a jury. Plaintiff overheard a juror suggest he was too old to have committed the rape.

41. Had DPD tested and acted on the earlier rape kits, Harris could have been identified and incapacitated before he raped Plaintiff in 2008.

42. The failures were compounded by mishandling: the prosecutor and investigator assigned to Plaintiff's case against Harris were later fired for their handling of it.

**D. The City's Pattern and Practice**

43. The warehousing of nearly 12,000 untested kits, the routine failure to investigate sexual assaults, and the documented practice of degrading, dismissing, and disbelieving sexual assault survivors, including the use of derogatory slurs memorialized in original backlog police reports, and the remark to Plaintiff that she was reporting a "trick gone bad," reflect a municipal policy, custom, and practice of deliberate indifference to sexual assault survivors, who are overwhelmingly women, and 81%—9,186 individuals—were women of color.

44. That pattern denied survivors equal protection, left serial offenders free to reoffend, foreclosed prosecutions and shielded predators—including predators within DPD.

**E. Benjamin Wagner: A Known Predator in Uniform**

45. Benjamin Wagner served as a Detroit police officer for nearly three decades.

46. He now faces six counts of first-degree kidnapping and fourteen counts of first-degree criminal sexual conduct involving at least six women between 1999 and 2003.[1] The Wayne County Prosecutor published a press release on March 26, 2026 that specifies Wagner's victims were between the ages of 15 and 23 at the time of their assaults.[2]

47. His alleged method was consistent: stop a woman in a marked patrol car, use a false pretext, display his service weapon, and rape her. He targeted women who were alone, on foot, and vulnerable.

48. In 2002, Wagner was tried in Wayne County for sexually assaulting his stepdaughter. He was acquitted.

49. After the 2002 acquittal, the City returned Wagner to full duty—badge, gun, and patrol car included—without restrictions, monitoring, or investigation into whether he had victimized others.

50. Wagner continued to patrol the streets of Detroit for approximately fifteen more years after that reinstatement.

---

[1] https://www.freep.com/story/news/courts/2026/05/18/ex-detroit-police-sergeant-benjamin-wagner-to-stand-trial-serial-rapist/90140111007/?gnt-cfr=1&gca-cat=p&gca-uir=false&gca-epti=z116531p118450l003650c118450e1166xxv116531&gca-ft=273&gca-ds=sophi

[2] https://www.waynecountymi.gov/Prosecutor-Press-Releases/2026/Former-DPD-Sergeant-Benjamin-Wagner-Arraigned-in-Five-Sexual-Assault-Casess

51. The 2002 trial put the City on notice that Wagner posed a risk of sexual violence. The City returned him to the street anyway.

52. In or around March of 2026, DPD Chief Todd Bettison told Plaintiff that he knew there was problem with Officer Wagner, further confirming that DPD personnel had actual knowledge of concerns regarding Wagner before he retired.

53. Wagner retired from DPD in or about 2017 and relocated to Greenville, South Carolina.

54. The Michigan State Police linked Wagner's DNA to an unsolved sexual assault as early as 2010.

55. The FBI identified a lead connecting Wagner to multiple assaults in 2023.

56. Wagner was not arrested until March 2026—in Greenville, South Carolina—more than twenty years after he raped Plaintiff and more than fifteen years after the first DNA link. At no time before March 2026 did the City or DPD disclose to Plaintiff that DNA evidence linked a DPD officer to unsolved sexual assaults.

**F. The March 2026 Wagner Revelation — A New and Distinct Discovery**

57. In March 2026, through DNA testing connected to the rape kit backlog, Plaintiff learned for the first time that the man who kidnapped and raped her was Benjamin Wagner—a sworn Detroit police officer.

58. This discovery revealed a new dimension of the City's wrongdoing. The City did not merely fail to protect Plaintiff from a stranger. It armed, employed, and shielded the officer who raped her, while its evidence system concealed his identity for twenty years.

59. Wagner's concealment was twofold: he used his badge and gun to threaten Plaintiff into silence, and the City's warehousing of rape-kit evidence buried the DNA that would have identified him. Both acts of concealment are attributable to the City.

60. The State of Michigan did not charge Wagner until March 2026—approximately twenty years after the assault—corroborating that his identity was not reasonably ascertainable before the DNA match.

61. Before March 2026, Plaintiff could not reasonably have discovered the identity of the officer who assaulted her or that DPD possessed DNA evidence identifying him. Plaintiff exercised reasonable diligence under the circumstances, but the only evidence capable of identifying Wagner was in the exclusive control of the City. The 2016 notification concerned Jesse Harris—a civilian stranger. It did not reveal the identity of the officer who assaulted Plaintiff in 2005.

62. The March 2026 disclosure shows that the City's failures did not merely delay justice, they concealed a police officer's crimes for two decades.

**G. Tolling and Timeliness**

63. Plaintiff's claims are timely. Under MCL 600.5855, because Wagner and the City fraudulently concealed the existence of the claims and the identity of the person liable, Plaintiff had two years after she discovered, or should have discovered, Wagner's identity in March 2026 to commence this action. This action was filed within that period.

64. The concealment consisted of affirmative acts, not mere silence, including: (a) Wagner's threats that fellow officers would kill Plaintiff if she reported; (b) the City's storage of Plaintiff's and other survivors' evidence without testing or disclosure; (c) the City's failure to disclose the 2010 Michigan State Police DNA link and the 2023 FBI lead; and (d) the 2016 notification, which led Plaintiff to believe the City had resolved her case.

65. Plaintiff's claims are independently tolled by duress and equitable tolling, and her claims arising from criminal sexual conduct are timely under the limitations period provided by MCL 600.5805 for such claims, as tolled. Under federal law, Plaintiff's § 1983 claims did not accrue until she knew or had reason to know the identity of the person who caused her injury, and any limitations period was equitably tolled by Defendants' concealment.

## CLASS ALLEGATIONS

66. Plaintiff brings this action individually and as a class action on behalf of all others similarly situated pursuant to Federal Rule of Civil Procedure 23.

67. This action satisfies the numerosity, commonality, predominance, typicality, and adequacy elements of the rule.

68. The proposed class is currently defined as:

**All sexual assault survivors in the City of Detroit whose sexual assault evidence kits ("rape kits") were collected by or submitted to DPD and went untested or uninvestigated as part of the Detroit rape kit backlog during the applicable limitations period ("Class").**

69. **Numerosity (Rule 23(a)(1)):** The Class consists of thousands of survivors (nearly 12,000 kits were discovered untested), and joinder of all members is impracticable. The Class is ascertainable from DPD records, Wayne County records, SAKI/testing records, and Prosecutor's Office files.

70. **Commonality (Rule 23(a)(2)):** Common questions of law and fact exist, including: whether Defendants maintained a policy, custom, or practice of failing to test and investigate rape kits; whether that policy reflected deliberate indifference and gender-based discrimination; whether it created a state-created danger to the Class; whether Defendants concealed the backlog; whether limitations

were tolled as to the Class; and whether class-wide injunctive and declaratory relief is warranted.

71. **Typicality (Rule 23(a)(3)):** Plaintiff's claims arise from the same course of conduct, policies, and legal theories as the claims of the Class members.

72. **Adequacy (Rule 23(a)(4)):** Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff's interests are not antagonistic to those of other Class members, and her counsel are experienced in complex civil rights and class action litigation.

73. Predominance and Superiority (Rule 23(b)(3)): Common issues concerning Defendants' uniform conduct, policies, and customs predominate over individual issues. A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

74. Injunctive and Declaratory Relief Class (Rule 23(b)(2)): Defendants acted or refused to act on grounds generally applicable to the Class, making appropriate final declaratory and injunctive relief with respect to the Class as a whole, including mandatory testing, investigation, training, supervision, and oversight reforms.

## <u>COUNT I</u>
## 42 U.S.C. § 1983: Fourth Amendment — Unreasonable Seizure / False Arrest
## (Against Defendant Wagner)

75. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

76. On or about October 2005, Officer Wagner, acting under color of state law and in a marked Detroit police vehicle, conducted a pretextual curfew stop of Plaintiff without reasonable suspicion or probable cause.

77. Officer Wagner forced Plaintiff into his police car at gunpoint, stating "don't run or I'm going to shoot you," and seized and detained her without lawful basis.

78. Officer Wagner transported Plaintiff against her will to an abandoned area, where he continued to detain her.

79. The seizure was objectively unreasonable under the Fourth Amendment to the United States Constitution.

80. As a direct and proximate result of Officer Wagner's conduct, Plaintiff suffered severe physical injury, emotional distress, psychological harm, loss of liberty, and other damages. Plaintiff seeks compensatory and punitive damages against Officer Wagner.

## COUNT II
## 42 U.S.C. § 1983: Fourth Amendment — Excessive Force
## (Against Defendant Wagner)

81. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

82. Wagner, acting under color of law, displayed and used a firearm, held the gun to Plaintiff's head, repeatedly clicked the trigger, threatened to kill her, and forcibly raped her at gunpoint.

83. Officer Wagner's use of force was objectively unreasonable under the Fourth Amendment and served no legitimate law-enforcement purpose.

84. As a direct and proximate result of Wagner's use excessive force, Plaintiff suffered severe physical injury, emotional distress, psychological harm, permanent disability, and other damages. Plaintiff seeks compensatory and punitive damages against Wagner.

**COUNT III**
**42 U.S.C. § 1983: Fourteenth Amendment — Substantive Due Process / Bodily Integrity**
**(Against Defendant Wagner)**

85. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein. This Count is pleaded in the alternative to Counts I and II, to the extent any of Wagner's conduct is found to fall outside the Fourth Amendment seizure.

86. Wagner's rape of Plaintiff while acting under color of law—a violent sexual assault of a person seized at gunpoint—shocks the conscience and violated Plaintiff's Fourteenth Amendment right to bodily integrity.

87. Plaintiff has a clearly established constitutional right to bodily integrity, which Officer Wagner violated.

88. As a direct and proximate result of Wagner's conduct, Plaintiff suffered severe physical injury, emotional distress, psychological harm, loss of bodily autonomy, permanent disability, and other damages. Plaintiff seeks compensatory and punitive damages against Wagner.

## COUNT IV
**42 U.S.C. § 1983: Fourteenth Amendment — Equal Protection (Gender-Based Discriminatory Policing) / Monell (Against Defendants City of Detroit and DPD)**

89. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

90. Defendants City of Detroit and DPD maintained a policy, custom, and practice of failing to investigate sexual assaults and degrading female complainants because of sex, in violation of the Equal Protection Clause of the Fourteenth Amendment.

91. The policy was carried out through the warehousing of rape kits, routine dismissal and degradation of sexual assault complainants, and chronic under-resourcing of sexual assault investigations, while comparable evidence in other violent crimes was submitted and processed.

92. This policy was adopted and maintained because of, and not merely in spite of, its effect on women, as shown by the sex-based slurs used by officers, the dismissal of complainants as liars and prostitutes, and the differential treatment of

sexual assault evidence compared with evidence of other crimes. It also reflected deliberate indifference to the constitutional rights of sexual assault survivors.

93. As a direct and proximate result of Defendants' discriminatory policies, Plaintiff and the Class were denied equal police protection and suffered damages including severe emotional distress, psychological harm, denial of constitutional rights, and exposure to further sexual violence. Plaintiff and the Class seek compensatory damages and declaratory and injunctive relief.

## COUNT V
## 42 U.S.C. § 1983: Substantive Due Process — State-Created Danger / Deliberate Indifference / Monell
## (Against Defendants City of Detroit and DPD)

94. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

95. Defendants City of Detroit and DPD, through their affirmative policy of storing untested rape kits in an unsecured warehouse and failing to investigate sexual assaults, left identifiable serial rapists free to reoffend, and increased the danger to Plaintiff and the Class.

96. Defendants' conduct shocks the conscience and reflects deliberate indifference to the known danger that serial rapists, identifiable through testing, posed to the public—including Plaintiff and the Class. Plaintiff and Class members were foreseeable victims of Defendants' affirmative acts and omissions.

97. Had Defendants tested the kits and investigated the assaults, serial offenders including Jesse Harris and Lavelle Davis could have been identified and incarcerated before raping Plaintiff and others.

98. The risk Defendants created was different from and greater than the risk facing the general public, because Plaintiff and the Class were sexual assault survivors who had entrusted their evidence to DPD and were owed a specific duty arising from that relationship.

99. As a direct and proximate result of Defendants' state-created danger, Plaintiff and the Class suffered damages including physical injury, severe emotional distress, psychological harm, and the denial of constitutional rights. Plaintiff and the Class seek compensatory damages and declaratory and injunctive relief.

## COUNT VI

**42 U.S.C. § 1983: Municipal Liability Under Monell —Policy, Custom, and Practice (Against Defendant City of Detroit)**

100. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

101. The City maintained a persistent and widespread custom of non-testing, non-investigation, and victim mistreatment that constituted municipal policy.

102. The City ratified unconstitutional conduct by failing to discipline, correct, or remedy the warehousing of kits and mistreatment of complainants.

103. The later firing of the prosecutor and investigator assigned to Plaintiff's case further reflects the systematic mishandling of rape-kit prosecutions.

104. As a direct and proximate result of the City's policies, customs, and practices, Plaintiff and the Class suffered constitutional injuries and other damages. Plaintiff and the Class seek compensatory damages and declaratory and injunctive relief.

## COUNT VII
## 42 U.S.C. § 1983: Failure to Train, Supervise, and Discipline
## (Against Defendants City of Detroit and DPD)

105. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

106. Defendants City of Detroit and DPD were deliberately indifferent to the need to train, supervise, and discipline officers and investigators handling sexual assault cases and sexual assault evidence.

107. Defendants failed to train officers to treat sexual assault complainants with respect, to properly record and investigate reports, and to handle, preserve, and submit rape kits for testing.

108. Despite actual notice—including Wagner's 2002 trial for sexually assaulting his stepdaughter and the knowledge of DPD personnel, as later confirmed by DPD Chief Todd Bettison, that there was a problem with Officer Wagner—the City failed to adequately investigate, supervise, discipline, or restrict Wagner.

109. Defendants further failed to supervise Officer Wagner, whose conduct—kidnapping and raping a civilian while on duty in a marked police car—reflects a failure of oversight so severe as to constitute deliberate indifference.

110. As a direct and proximate result of Defendants' failures to train, supervise, and discipline, Plaintiff and the Class suffered damages. Plaintiff and the Class seek compensatory damages and declaratory and injunctive relief.

## COUNT VIII
## 42 U.S.C. § 1983: Denial of Access to the Courts (Against Defendants City of Detroit and DPD)

111. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

112. Following Wagner's 2002 trial for sexually assaulting his stepdaughter, a final policymaker for the City made the deliberate decision to return Wagner to full patrol duty, armed and alone in a marked car, without restriction, monitoring, or investigation.

113. The plainly obvious consequence of that decision was that Wagner would use his police authority to sexually assault women, and that risk materialized when Wagner used his patrol car, service weapon, and badge to kidnap and rape Plaintiff in October 2005.

114. The City's retention and failure to supervise Wagner was the moving force behind the violation of Plaintiff's Fourth and Fourteenth Amendment rights described in Counts I through III.

115. Plaintiff and Class members had a constitutional right to meaningful access to the courts, including the right to seek criminal prosecution of their assailants and to pursue civil remedies.

116. The backlog delay impaired those remedies and foreclosed prosecutions of identified serial offenders. Jesse Harris was a known serial rapist, but Plaintiff's case was the only one prosecutable because the limitations period had run on his other victims' cases.

117. Defendants' conduct caused actual injury to Plaintiff and the Class by rendering their claims unenforceable and denying them a meaningful remedy through the courts.

118. As a direct and proximate result, Plaintiff and the proposed Class suffered as described above. Plaintiff and the proposed Class seek compensatory damages and declaratory and injunctive relief.

## COUNT IX
**Violation of the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq.**
**(Against Defendants City of Detroit and DPD)**

119. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

120. Under the Elliott-Larsen Civil Rights Act, MCL 37.2101 et seq., it is unlawful to deny an individual the full and equal enjoyment of public services because of sex.

121. Defendants City of Detroit and DPD provide public services, including police investigative services, to the residents of Detroit.

122. Defendants denied Plaintiff and the Class full and equal enjoyment of police investigative services on the basis of sex by systematically failing to test rape kits, investigate sexual assaults, and treat sexual assault complainants—who are overwhelmingly women—with the same seriousness and professionalism afforded to victims of other crimes.

123. As a direct and proximate result, Plaintiff and the Class suffered damages. Plaintiff and the Class seek compensatory damages, statutory remedies, and declaratory and injunctive relief.

**COUNT X**
**Gross Negligence**
**(Against DPD Doe Defendants)**

124. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

125. DPD Doe Defendants—individual officers, investigators, evidence technicians, and supervisors—owed a duty of care to Plaintiff and the Class to properly handle, store, test, and investigate sexual assault evidence kits.

126. DPD Doe Defendants breached that duty through conduct so reckless as to demonstrate a substantial lack of concern for whether injury would result, including warehousing kits without testing, failing to investigate reported assaults, degrading complainants, discarding evidence, and approving Wagner's unrestricted return to patrol. This conduct was the proximate cause of Plaintiff's injuries.

127. As a direct and proximate result, Plaintiff and the Class suffered damages including physical injury, severe emotional distress, and psychological harm. Plaintiff seeks compensatory and exemplary damages against the Doe Defendants in their individual capacities.

**COUNT XI**
**Assault and Battery / Criminal Sexual Conduct**
**(Against Defendant Officer Wagner)**

128. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

129. Officer Wagner committed an assault and battery upon Plaintiff by engaging in nonconsensual sexual penetration and offensive physical contact at gunpoint.

130. Officer Wagner's conduct constitutes criminal sexual conduct under Michigan law.

131. As a direct and proximate result of Officer Wagner's assault and battery, Plaintiff suffered severe physical injury, emotional distress, psychological

harm, and permanent disability. Plaintiff seeks compensatory and exemplary damages against Officer Wagner.

**COUNT XII**
**False Imprisonment**
**(Against Defendant Officer Wagner)**

132. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

133. Officer Wagner unlawfully confined and restrained Plaintiff by forcing her into his police vehicle at gunpoint and transporting her against her will to an abandoned location.

134. Plaintiff did not consent to the confinement. Plaintiff was restrained by physical force and the threat of deadly force and had no reasonable means of escape.

135. As a direct and proximate result, Plaintiff suffered severe emotional distress, psychological harm, loss of liberty, and other damages. Plaintiff seeks compensatory and exemplary damages against Officer Wagner.

**COUNT XIII**
**Intentional Infliction of Emotional Distress**
**(Against Defendant Officer Wagner)**

136. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

137. Wagner's conduct—seizing Plaintiff at gunpoint, driving her to an abandoned area, holding a gun to her head, repeatedly clicking the trigger,

threatening to kill her, raping her, and threatening that his police "buddies" would "come and finish the job" if she reported the assault—was extreme and outrageous conduct that goes beyond all possible bounds of decency.

138. Officer Wagner acted intentionally and recklessly, knowing that his conduct would cause severe emotional distress.

139. As a direct and proximate result of Officer Wagner's extreme and outrageous conduct, Plaintiff suffered severe emotional distress, psychological harm, permanent disability, and other damages. Plaintiff seeks compensatory and punitive damages against Officer Wagner.

## COUNT XIV
## Violation of the Michigan Constitution, Article 1, § 17 — Due Process / Right to Bodily Integrity (State-Created Danger)
## (Against Defendants City of Detroit and DPD)

140. Plaintiff incorporates by reference each and every allegation set forth in the preceding paragraphs as if fully repeated herein.

141. Article 1, § 17 of the Michigan Constitution provides, in pertinent part, that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law."

142. The Michigan Constitution's due-process clause protects the fundamental right to bodily integrity and liberty from state action that shocks the conscience or creates a danger to identifiable individuals.

143. Through their policy of warehousing untested rape kits and exposing survivors to identified but unapprehended serial rapists, Defendants recklessly created and increased a danger to Plaintiff and the Class beyond the danger faced by the public generally.

144. Plaintiff and Class members, as sexual assault survivors who had reported their assaults and submitted to rape kit evidence collection, were foreseeable victims of Defendants' deliberate indifference.

145. Defendants' warehousing of kits, refusal to investigate, and decision to leave serial offenders at large affirmatively caused and increased the risk of physical and emotional harm to Plaintiff and Class members.

146. Defendants' conduct shocks the conscience and deprived Plaintiff and the Class of liberty and bodily integrity without due process of law, in violation of Article 1, § 17 of the Michigan Constitution.

147. As a direct and proximate result, Plaintiff and the Class suffered damages including physical injury, severe emotional distress, psychological harm, loss of liberty and bodily autonomy, permanent disability, and denial of constitutional rights. Plaintiff and the Class seek compensatory damages and declaratory and injunctive relief.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, individually and on behalf of the proposed Class, respectfully prays that this Court enter judgment against Defendants and grant the following relief:

(a) An order certifying this action as a class action pursuant to Federal Rules of Civil Procedure 23(b)(2) and 23(b)(3), appointing Plaintiff as Class Representative, and appointing Stinar Lannen, PLLC as Class Counsel;

(b) A declaratory judgment that Defendants' policies, customs, and practices violated the Constitution of the United States, Article 1, § 17 of the Michigan Constitution, and applicable law;

(c) A permanent injunction requiring the City of Detroit and DPD to test all outstanding rape kits, investigate all associated sexual assaults, implement trauma-informed training and supervision of officers handling sexual assault cases and evidence, and establish oversight, monitoring, and survivor-notification reforms;

(d) Significant compensatory damages exceeding $10,000,000.00, together with all other forms of damages and relief to which Plaintiff and the proposed Class are entitled, in an amount to be determined at trial;

(e) Punitive damages under 42 U.S.C. § 1983, and exemplary damages under Michigan law, against the individual Defendants (Officer Wagner and Doe Defendants);

(f) Reasonable attorneys' fees and costs pursuant to 42 U.S.C. § 1988 and other applicable law;

(g) Pre-judgment and post-judgment interest as permitted by law;

(h) Such other and further relief as this Court deems just and equitable.

Dated: October 23, 2026

Respectfully submitted,

**STINAR LANNEN, PLLC**

By: /s/ *Patrick C. Lannen*
Patrick C. Lannen (P73031)
Parker G. Stinar (P75252)
Erik H. Johnson (P85017)
Brooke A. Seely (P86293)
patrick@stinarlannenlaw.com
parker@stinarlannenlaw.com
erik@stinarlannenlaw.com
brooke@stinarlannenlaw.com
280 West Maple, Suite 200
Birmingham, Michigan 48009
(248) 565-2690

*Attorneys for Plaintiff and the Proposed Class*

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a trial by jury on all issues so triable.

Dated: October 23, 2026

Respectfully submitted,

**STINAR LANNEN, PLLC**

By: /s/ *Patrick C. Lannen*
Patrick C. Lannen (P73031)
Parker G. Stinar (P75252)
Erik H. Johnson (P85017)
Brooke A. Seely (P86293)
patrick@stinarlannenlaw.com
parker@stinarlannenlaw.com
erik@stinarlannenlaw.com
brooke@stinarlannenlaw.com
280 West Maple, Suite 200
Birmingham, Michigan 48009
(248) 565-2690

*Attorneys for Plaintiff and the Proposed Class*